## INJUNCTION AGAINST UNWARRANTED INTERFERENCE WITH EMPLOYES.

Common Pleas Court of Cuyahoga County.

UNITED TAILORS COMPANY V. JOINT BOARD OF AMALGAMATED WORKERS OF AMERICA, ET 'AL.

Decided, September 24, 1926.

*Labor Disputes—Rights of the Employer, the Labor Union, and Non-Union Employes must all be Scrupulously Maintained— Forces within Labor Unions are their Greatest Foe.*

Injunction lies against the picketing of a plant and attempts to persuade employees to quit work, where the entire force is laboring under contracts for a definite time and no legitimaté trade dispute exists.

HAY, J.

This is an action brought by the United Tailors Company, a corporation, against Benjamin Pepercorn individually and as manager of the Joint Board of Amalgamated Clothing Workers of America and of Locals Numbers 112, 124 and 126, of The Amalgamated Clothing Workers of America, and other persons individually and as officers or members of said locals and said Joint Board above mentioned, and seeks to enjoin said defendants and each and all of the officers and members of said unions and all other persons associated with them, from picketing plaintiff's plant and doing various other things set forth in the amended and supplemental petition.

The issues in the pleadings are familiar to counsel and I will not take time to repeat them here.

The evidence discloses substantially the following facts:

1. That the plaintiff corporation is the owner of a small plant located at the corner of Euclid Avenue and East 66th street in the city of Cleveland, and doing business in the sixth story of the building located there.

2. That said corporation when running in full force employs a force of from thirty-five to forty persons consisting of both men and women, and that said plaintiff gave employment to its force about fifty weeks during the year.

3. That said corporation was preceded by a partnership and that the partnership and corporation have been engaged in the business of garment making for the past seven years.

4. That neither said partnership nor said corporation has ever had any relation with the union or locals involved in this case, or any other union, but has conducted what is called an open shop, employing mostly non-union labor, but had at the time the picketing of the plant was ordered about four union members in its employ.

5. That there was never any contractual relations between either said partnership or said plaintiff with any union.

6. That said plaintiff did not pay as high wages as union laborers of the same kind receive in Cleveland, but that it employed its help more steadily and that the wages of its help at the end of the year were about the same as as the yearly wages of the union who received higher wages during the rush season and received but little if any during the slack season.

7. That the picketing was caused, according to the testimony of Benjamin Pepercorn, agent of said union, and the testimony of one of the union men employed by plaintiff, by complaint made by a union pocket maker employed by plaintiff. That the testimony of this pocket maker discloses that he received on an average of about forty dollars a week or about two thousand dollars a year. The business manager testified that after complaint was made to him by said pocket maker he attempted to have an interview with the business manager at the factory, but was not able to secure it, but did have a short interview with him just before the picketing was ordered in an interview on Superior street. This, however, the manager of plaintiff denies.

8. That between 3:00 and 4:00 o'clock p. m. on August 26, last, pickets appeared around the plant of plaintiff, but the union as well as non-union workers remained at their work until closing time when the two union pocket makers joined the picket force; that probably the next day a non-union worker joined the union and became a part of the picketing crew; that these two pocket makers as soon as they joined in the picketing were called up into the office of plaintiff and paid off and discharged.

9. Said business manager testified that he never ordered more than six pickets to be placed at this plant, but plaintiff's witnesses testified there were as many as from ten to twenty there at the same time; that said pickets carried

placards on the sidewalk in front of said factory upon which were inscribed—"The workers of The United Tailors Company are receiving starvation wages. Do not scab your fellow workers." That this placard was signed by the defendants.

10. That immediately after said picketing began employes were accosted as they came out of the plant and in some instances followed to their homes by the picketers in automobiles; that in one instance the son of the manager of the plant was assaulted as he was attempting to convey two or three of the lady employees to their respective homes; that on such occasion some of the inmates of the automobile which was following these employes drew their hands across their throats which act led such lady employes to believe violence would be attempted if they continued to work for plaintiff.

11. That four of said picketers followed a young single man to his home, sought an interview with his father who was probably a member of some other union, and asked the father to induce the boy to cease working for the plaintiff; that they also asked the boy to come down the next morning and join their union and perhaps made some threats to him; that the boy failed to join the union, and two or three nights thereafter an automobile drew up in front of his home and three bottles containing some liquid with an extremely bad odor were thrown through the front windows of the house damaging the wall paper and causing other damage and inconvenience to the innocent owner of the home.

12. That on or about August 30th each of the employes of plaintiff who remained at work signed a contract of employment for a period of one month beginning August 30th, 1926, and ending on the 30th day of September, 1926; that one provision of said contract is that unless written notice is given fifteen days prior to the expiration date that said agreement shall be considered renewed for the ensuing period of one month upon the same terms and conditions.

That the defendants were notified of the existence of these contracts, but continued the picketing and their efforts to induce plaintiff's employes to leave their employment and breach said contracts; that in many instances violent language was aplied to them and threats made.

It is but fair to the defendants to say that they denied all these alleged acts of violence and intimidation, and claim that they used nothing but peaceful methods in attempting to persuade the employes of plaintiff to leave their employment.

Counsel for the defendants put on one lady witness who claimed that she did not know what was in her contract although she had signed it. She stated, however, that her wages were $18.00 a week and she was satisfied with her job. This is the only witness who was called in reference to these contracts.

Counsel for defendants contend that as these contracts were secured after the picketing began, they were evidently obtained for the purpose of this suit and ought not to be considered. We do not think, however, that this contention of counsel can be sustained, as the contracts were executed and delivered before this suit was begun, and there was no evidence introduced to show that the contracts are not valid and binding or that the parties thereto are not perfectly satisfied with the terms and conditions thereof.

The entire working force of plaintiff was subpoenaed by defendant and in attendance one afternoon during the hearing, but it is significant that only the one lady was placed on the witness stand to testify in reference to these contracts.

We have no difficulty in finding that the defendants should be enjoined from attempting to persuade the employes under contract with the plaintiff to breach their contracts. The holdings of our courts are uniform that injunctions should be granted to prevent such action.

We also have no difficulty in finding that the defendants should be enjoined from threatening prospective employes or in any way intimidating them.

The serious question is whether the defendants have any right to picket the plant of plaintiff at all. The defendants contend there is a legitimate trade dispute which justifies the picketing while the plaintiff contends that there never were any relations between the plaintiff and the union and no such trade dispute exists. The late Judge Foran in the case of *Park* v. *Hotel et al Employes*, reported in Vol. 22, page 257, N. P. (N.S.), defines a trade dispute as follows:

"A trade dispute can only exist or arise where there is a stoppage of work by employes, or lock out by the employer, and there is an intention or reasonable expectation upon the part of both employes and employer to resume the relation of employer and employe upon the satisfaction of certain specified conditions prescribed or agreed to by one or both of the parties to the dispute."

In the instant case the two pocket makers in question stopped work, but did not stop until after the picketing was ordered and the pickets had appeared at the plant. This is the frail foundation on which the claim of a trade dispute exists. Neither of these men had made any complaint to the plaintiff about wages or working conditions, but one of them testified he had made complaint to the business manager of the union. Both of these men continued at their work after the pickets came until the close of the day when they joined the pickets and were then paid off and discharged.

Can it be said that there is an intention and reasonable expectation upon the part of these two employes and the plaintiff to resume the relation of employe and employer as the result of future negotiations? We think not. We are of the opinion that neither of these two pocket makers nor the plaintiff ever expect to resume their former relations. We are forced to the conclusion from the evidence that the picketing of this plant was not called for that purpose, but rather to further the general interests of the union and its members.

As we understand the rule of the union they are not supposed to work by the side of non-union men or women. In this case they did so voluntarily, knowing that the plant of plaintiff was an open shop and with knowledge of all the conditions under which they accepted employment.

Since the decision of the Supreme Court of Ohio in the case of *La France Co.* v. *Electrical Workers,* reported in 108 O. S., the law in reference to the rights of striking workmen and the picketing of the plants of employers has been clarified. While in that case the right of strikers to peacefully picket a plant and attempt in a peaceful manner to persuade employes to leave their employment was upheld, it was on the ground that in such case there was a legitimate trade dispute and that the contract existing between the employer and the employes was merely a con-

tract at will and not a definite contract as in this case.

Judge Allen, who wrote the opinion of the court in that case, uses the following language in the final paragraph of her opinion:

"Equality of justice demands that in any controversy the rights of all parties be scrupulously maintained. The right of workmen to be employed, irrespective of union member-ship, must be maintained; the right of the employer to con-duct his business without illegal interference must be up-held; and legal means employed by strikers must not be curtailed. Among the latter are the right of peaceful pick-ing, the peaceful persuasion of employes to terminate con-tracts at will, and the peaceful persuasion of expectant employes not to accept work with the employer in ques-tion."

We are in accord with the principles announced by Judge Allen in said case, and we are also in sympathy with the general ideals and purposes of the unions. They have done much to better and further the interests of their members, but while their rights must be protected, the personal and property rights of employers and non-union employes must also be protected.

The greatest danger to the unions is not from forces without, but from forces within. Over-zealous members and friends often do more harm to the interests of the unions than the open foes outside. While the great mass of the people are friendly to the unions and their objects, they can not but deplore the many acts of lawlessness and dis-order that so often accompany strikes and picketing of plants. The truest friends of the unions are those who do not believe that "the end justifies the means," but who be-lieve as Judge Allen has well said that "Equality of justice demands that in any controversy the rights of all parties be scrupulously maintained."

Finding in this case as we must that the entire working force of the plaintiff are laboring under a contract for a definite time and that there is no legitimate trade dispute existing between the plaintiff and the defendants, the in-junction will be allowed as prayed for.

An entry may be drawn accordingly and bond in case of appeal fixed at $500.